336 N.W.2d 73 (1983)
214 Neb. 642
Ronald BICKFORD, Appellant,
v.
BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 82 OF HALL COUNTY, Nebraska, a political subdivision of the State of Nebraska, Appellee.
No. 82-313.
Supreme Court of Nebraska.
June 17, 1983.
*74 Mark D. McGuire of Crosby, Guenzel, Davis, Kessner & Kuester, Lincoln, for appellant.
D. Steven Leininger of Luebs, Dowding, Beltzer, Leininger, Smith & Busick, Grand Island, for appellee.
BOSLAUGH, McCOWN, and HASTINGS, JJ., and BRODKEY, J., Retired, and COLWELL, D.J., Retired.
BRODKEY, Justice, Retired.
This is an appeal in a proceeding in error to review an order of the board of education of school district No. 82 of Hall County in which the board terminated appellant Bickford's teaching contracts for the years 1980-81 and 1981-82. Bickford then filed his petition in error in the District Court for Hall County, and the bill of exceptions containing the testimony before the board of education was received as an exhibit in the hearing before the District Court, as were also the exhibits received in evidence at such hearing. The District Court rendered its decision on February 5, 1982, finding that the plaintiff in error did, in fact, breach the terms of his contracts, for the reasons set out in the journal entry of the judgment, and found that the evidence submitted to the board of education was sufficient as a matter of law to sustain the decision of the board in discharging Bickford from his employment with Northwest High School; and the court therefore found in favor of the defendant on the plaintiff's petition in error and affirmed the decision entered by defendant board of education on July 22, 1981, finding specifically that Bickford had breached the terms of his contracts because of neglect of duty and unprofessional conduct. Bickford then perfected his appeal to this court. We affirm.
At the outset it should be noted that there are two separate and distinct methods by which teaching contracts may be terminated. The first is by virtue of the reasons and for the causes set forth in the applicable statutes of the State of Nebraska dealing with said matters; and the second is by virtue of the provisions of the teaching contract itself. In any event it is the general rule that contracts include applicable statutory provisions, whether specifically mentioned or not, and therefore the grounds for termination in this case would and do include both the statutory provisions and the specific additional contractual provisions, if valid.
We first examine the pertinent provisions of Bickford's contract with the school district, copies of which are contained in the record of this case as exhibits. Said contract contains the following provision, among others: "FOURTH: During a school year covered by this agreement, in the event the Teacher violates any of the provisions of this agreement, or performs any act or does anything which is materially harmful to the employer, or which, substantially *75 inhibits the Teacher's ability to discharge the duties as set forth herein, including, but not limited to (a) becoming legally disqualified to teach in the State of Nebraska; (b) participation in any fraud; (c) causing any intentional damage to property; (d) engaging in any unlawful act; (e) becoming physically or mentally disabled; (f) insubordination; (g) neglect of duty; or (h) immorality; then the Teacher may be discharged; provided the Teacher has been given the cause or causes for discharge in writing and has been given an opportunity for and due notice of a hearing before the Board prior to official action being taken. Nothing contained herein shall prevent the suspension of the teacher, with pay, from his/her duties during the pendency of such proceedings." (Emphasis supplied.)
The pertinent statutory provisions applicable to Class VI school districts (which includes Grand Island) during the time frame involved in this case are set out in Neb.Rev.Stat. § 79-1254 (Reissue 1981), which, so far as pertinent to this case, reads as follows: "The original contract of employment with an administrator or a teacher and a board of education of a Class I, II, III, or VI district shall require the sanction of a majority of the members of the board. Except for the first two years of employment under any contract entered into after February 26, 1975, any contract of employment between an administrator or a teacher who holds a certificate which is valid for a term of more than one year and a Class I, II, III, or VI district shall be deemed renewed and shall remain in full force and effect until a majority of the members of the board vote on or before May 15 to amend or to terminate the contract for just cause at the close of the contract period. The first two years of the contract shall be a probationary period during which it may be terminated without just cause.... The secretary of the board shall, not later than April 15, notify each administrator or teacher in writing of any conditions of unsatisfactory performance or other conditions because of a reduction in staff members or change of leave of absence policies of the board of education which the board considers may be just cause to either terminate or amend the contract for the ensuing school year." (Emphasis supplied.)
Then follow provisions in said section that any teacher or administrator so notified shall have a right to file, within 5 days of such notice, a request for a hearing before the board, and upon receipt of the request the board shall order the hearing to be held within 10 days and give notice of the time and place of the hearing to the teacher or administrator; and that, at the hearing, evidence shall be presented in support of the reasons given for considering termination or amendment of a contract, and that the teacher or administrator shall be permitted to produce evidence relating thereto.
The section then continues as follows: "The board shall render the decision to amend or terminate a contract based on the evidence produced at the hearing. As used in this section and section 79-1254.02, the term just cause shall mean incompetency, neglect of duty, unprofessional conduct, insubordination, immorality, physical or mental incapacity, other conduct which interferes substantially with the continued performance of duties or a change in circumstances necessitating a reduction in the number of administrators or teachers to be employed by the board of education. No member of the board of education may cast a vote in favor of the election of any teacher when such member of the board is related by blood or marriage to such teacher." (Emphasis supplied.)
We point out, in passing, however, that the foregoing § 79-1254 was repealed and § 79-1254.02 was amended by 1982 Neb. Laws, L.B. 259, which became operative on September 1, 1982.
Section 1(4) of the new law, L.B. 259, provides: "Just cause shall mean: (a) Incompetency; (b) neglect of duty; (c) unprofessional conduct; (d) insubordination; (e) immorality; (f) physical or mental incapacity; (g) failure to give evidence of professional growth as required in section 7 of this act; or (h) other conduct which interferes *76 substantially with the continued performance of duties."
Likewise, § 4 of L.B. 259 provides: "(1) The contract of any certificated employee... may be canceled or amended by a majority of the members of the school board during the school year for any of the following reasons: (a) Upon cancellation, termination, revocation, or suspension of a teacher's certificate, by the State Board of Education, or of the Nebraska Administrative and Supervisory Certificate or the Nebraska Professional Administrative and Supervisory Certificate of any certificated employee whose duties require such a certificate; (b) breach of any of the material provisions of the teacher's or administrator's contract; (c) for any of the reasons set forth in the employment contract; (d) incompetency; (e) neglect of duty; (f) unprofessional conduct; (g) insubordination; (h) immorality; or (i) physical or mental incapacity."
In the instant case, however, it appears that all of the acts and conduct referred to occurred prior to September 1, 1982, the effective date of L.B. 259.
In his journal entry made in connection with his judgment affirming the decision of the defendant board of education, the trial judge made certain findings of fact which find support in the record in this case. Among such findings are the following: "1. The plaintiff, Ronald Bickford, was employed as a tenured guidance counselor for Northwest High School and in charge of the juniors and seniors at said school.
"2. A contract of employment for the 1980-81 school year was in place and said contract had been automatically renewed pursuant to § 79-1254.
"3. The contracts are part of the record and provide that certain actions by a teacher may subject the teacher to discharge, which actions include, but are not limited to, neglect of duty.
"4. Following certain events which came to the attention of the school administration, and particularly the Principal, Clayton Luther, after April 15, 1981, the administration recommended the discharge of the Plaintiff from his then existing 1980-81 contract and the contract for the 1981-82 school year.
"5. The Plaintiff was provided a notice in writing of the causes which constituted grounds for discharge and a hearing was held before the Defendant Board of Education, after notice, on July 13, 1981.
"6. On July 22, 1981, the Board of Education discharged the Plaintiff from his employment under both contracts and made a written finding that the Plaintiff had breached the terms of the contract because of his neglect of duty and his unprofessional conduct.
"7. The record indicates that Ronald Bickford breached the terms of his 1980-81 contract and the terms of his 1981-82 contract because of his neglect of duty and his unprofessional conduct.
"8. In regard to his unprofessional conduct, the Court finds that the Plaintiff was untruthful in conversations with the Principal, Clayton Luther, on May 8 and May 12, 1981. The Court finds that prior to that time, and around April 13, 1981, Luther directed the Plaintiff to determine which students were having difficulty academically and to notify their parents. The Court further finds that Luther again told this to Plaintiff the following week.
"9. The Court finds that Bickford, on May 8, and again on May 12, 1981, told Luther that he had contacted all the parents as he had been directed by Luther to do. In fact, the Plaintiff had not contacted the parents of [names omitted], although those students were having academic difficulty which was known by the Plaintiff before May 8 and May 12, 1981.
"10. In regard to his neglect of duty, the Court finds that he did not adequately or properly perform his duties either as required by Principal Luther or as required by the written standards relating to guidance counselors (Exhibit # 3) and adopted by the Defendant, which Plaintiff himself helped author. The Court finds that the Plaintiff failed to register senior students *77 for classes which were necessary to meet graduation requirements and to register senior students with sufficient number of hours to meet graduation requirements. These students were [names omitted].
"11. Although not raised in Plaintiff's Petition-in-Error, the Plaintiff in his brief has alleged that his termination was motivated by Plaintiff's exercise of his First Amendment Rights. The Court finds that Plaintiff's argument on this point is not well taken and that any expression of First Amendment Rights by Plaintiff was not the motivating reason for his termination." (Emphasis supplied.)
On the basis of the above findings the District Court affirmed the decision of the board of education in discharging the plaintiff from his employment with Northwest High School.
The record reveals that, as a matter of fact, Bickford had been recommended for renewal and was automatically renewed under the statute because of the absence of notice of nonrenewal. However, the events that occurred and which led to the problems in this appeal all happened after April 15. The administration was suddenly confronted with problems when they learned that there were many students who had serious graduation problems and who were on the list of students not scheduled to graduate. Calls were made to the parents of the children in question, who indicated and testified that they had no knowledge of any problems with their children and were not contacted by Bickford, although he had been ordered by Principal Luther to contact the parents of the students having problems in graduating on at least four separate occasions. We quote from the record the testimony of Principal Luther: "Q. Let me take you back a bit before May 13. Can you tell the board whether anything transpired during the week of April 13? A. Week of April 13, in passing, I stopped in Mr. Bickford's office and asked himtold him to make sure that he find out which students were having difficulty academically and to notify the parents so that we did not have any problems come graduation. Q. By when was Mr. Bickford to have notified the parents? A. As soon as possible.... Q. What happened next, if anything? A. The week of April 20 I again asked Mr. Bickford to contact the parents and basically asked him how it was coming. We had a discussion at that time. He asked me, `Is this really my responsibility?' And at that time I said that yes, it was his responsibility, that I wanted him to communicate with the parents. That was on the 23rd of April and on the 24thQ. ... A. On the 24th, which was a Friday and 27th, which was a Monday, there was a notice in the bulletin, which basically requested that teachers submit a list to the counselors of those students who were having difficulty and the message was the same in both the bulletins. Q. Did you have a conversation with Mr. Bickford after the 27th? A. The week of the 27thand I do not remember the exact dayMr. Bickford came to me with a list of students who were having difficulty. The list was a composite of a list from teachers. At that point, I asked if he had, in fact, contacted the parents and he said that he had not. Q. Did you then direct him to contact the parents? A. Yes, I directed him to contact the parents again.... Q. Did you have a conversation with Mr. Bickford on May 8? A. Yes, sir. Very early in the morning, approximately 8:05, I met with Mr. Bickford and specifically asked him if he had contacted the parents of students who were having difficulties academically. Q. What was Mr. Bickford's answer? A. He said, yes, he had contacted all the parents. Q. What happened then? A. May 8 was a Friday. May 12 I had scheduled conferences with both Mr. Beck and Mr. Bickford for the purposes of evaluation. Again, at that time, Isince I knew that both counselors were going to be gone, I wanted to make sure, if there were any unusual circumstances that Mr. Taylor or myself should be aware of, that we would be aware of them, and again I asked him if he contacted all the parents and he said, `Yes.'"
In addition there was received in evidence a portion of the handbook governing the duties of the teachers, and particularly *78 § 12.034 with regard to the duties of the guidance staff. Paragraph 4 of that document provides that it is the duty of the guidance staff to register all students in appropriate courses of study. Paragraph 7 states that it is the duty of the guidance staff to make students aware of graduation requirements and communicate with parents any problems that may arise. Bickford assisted in drafting this document.
As a result of Principal Luther's conversations with him, it appears that Bickford inserted in the school bulletins dated Friday, April 24, 1981, and Monday, April 27, 1981, the following: "We are down to approximately three weeks left for seniors. If you have any seniors who may not pass, notify the counselors. If you have any seniors whom you know as of now don't have a prayer of passing your class tell the counselors now."
As a result of the notices, Bickford received a list of some of the students who were having graduation difficulties. His independent attitude with reference to the directions of the principal is well illustrated by his testimony in the record as follows: "Q. What was your understanding of what you were supposed to do in reference to students who were having difficulty? Just what was your understanding? A. ... I didn't have to, I feel, send out a letter to the parents to scare them in regards to graduation problems. He wasn't in a problem area, as far as graduation was concerned. I knew what the teacher had told me. I knew what the student had told me after I got done talking to him and I didn't do any more sending out anything in regards to the parents on this, but I didn't feel that to send out letters to parents telling them that, `You're not going to graduate because of these particular (kids names)' would have been any different than sending a letter out to every kid because a student handbook says if you're not passing any class second semester that can be considered as a graduation requirement, and if that's the case and that's in the handbook, then I should have sent letters out to every kid we had in the senior class that was ever on the down list and that's ridiculous, so you have to have some common sense and opinion on the kids that are in trouble and that's what I done."
Bickford deliberately disregarded the orders and directions of his supervisor, the principal of the school, and pitted his own judgment against that of the supervisor, which he had no right to do. As previously stated, subsequent checks with the parents of the children having problems revealed that many of them were not, in fact, notified by Mr. Bickford prior to graduation date that their children had any problems with regard thereto. His refusal to do as the principal ordered, and his deliberate lying to the principal, clearly constitutes neglect of duty, which, under the terms of the contract with the school and the applicable statutory provisions, constitutes "just cause" for termination of the teacher because of its significant effect on the students, parents, and the working relationship which ought to exist between a principal of a school and the guidance counselor.
The record also reveals that Bickford had problems with certain other students because of his failure to keep them advised as to the requirements for graduation, and he did not check to see that they had the requisite number of hours of credit in the proper courses in order to graduate, as required by the duties of a guidance counselor, contained in the record. This also constitutes neglect of duty.
Although it is true that "unprofessional conduct" is not specifically listed as a reason for cancellation of a teacher's contract in the contract that Mr. Bickford had with the school board, nevertheless we believe the term is encompassed within the language of a contract which gives a right of discharge where the teacher performs any act or does anything which is materially harmful to the employer, and within the language in the statute in effect at that time with reference to "other conduct which interferes substantially with the continued performance of duties." We point out that the term "unprofessional conduct" *79 is now specifically included as a ground for discharge under L.B. 259, previously referred to, which became operative in September 1982.
In our opinion appellant's conduct constituted both a neglect of duty and unprofessional conduct, either one of which was sufficient grounds in the instant case to sustain the termination of the appellant from his position with the school.
We briefly comment on appellant's contention that his termination was motivated because he had exercised his first amendment rights by filing grievance procedures and speaking out with reference to certain insurance issues in the school. This issue was not raised or mentioned in any manner whatsoever in the petition in error filed in this case by the appellant. As early as 1898, we held in the case of Ainsworth v. Taylor, 53 Neb. 484, 73 N.W. 927 (1898), in discussing petitions in error, that the statutes "require that each alleged error shall be specially set forth in the petition in error. The strictness with which the requirements of specific assignments has been enforced is amply illustrated in every volume of the reports of the opinions of this court. Not only must the errors be pointed out in the petition in error, but even this is unavailing, if there has been a failure to file a motion for a new trial even in equity cases." Id. at 487-88, 73 N.W. at 928.
Likewise, Neb.Rev.Stat. § 25-1903 (Reissue 1979) states in part as follows: "The proceedings to obtain such reversal, vacation or modification shall be by petition entitled petition in error, filed in a court having power to make such reversal, vacation or modification, setting forth the errors complained of, and thereupon a summons shall issue and be served, or publication made, as in the commencement of an action." (Emphasis supplied.)
While some of the evidence contained in the record seems to indicate that a certain amount of friction existed between the principal and Bickford, which he denies, it does not in any way show that the motivation of the board of education in terminating his contracts was in any respect due to his exercise of his first amendment right of free speech. The principal, Clayton Luther, denied any such motivation in making his recommendation to the board, and it also appears that Luther had recommended renewal of Bickford's contract before knowing all the facts. One might ask why the administration would wait until after April 15 to raise the termination issue if the motivation for such action was Bickford's exercise of his first amendment right. The answer is self-evident. We find this assignment of error to be without merit.
From what we have stated above in this opinion, we conclude that the decision of the District Court affirming the action of the board of education must be, and hereby is, affirmed.
AFFIRMED.