IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

DOUGLAS COUNTY V. ARCHIE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DOUGLAS COUNTY, NEBRASKA, A POLITICAL SUBDIVISION OF THE
STATE OF NEBRASKA, APPELLANT,

V.

DANIEL ARCHIE AND THE DOUGLAS COUNTY CIVIL SERVICE COMMISSION, APPELLEES.

Filed July 19, 2016.    No. A-15-322.

Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Reversed and remanded with directions.

Donald W. Kleine, Douglas County Attorney, Meghan M. Bothe, and Timothy K. Dolan for appellant.

Rick G. Wade, of Norby & Wade L.L.P., for appellee Daniel Archie.

MOORE, Chief Judge, and IRWIN and BISHOP, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Douglas County appeals from an order of the district court affirming a decision of the Douglas County Civil Service Commission (the Commission). The Commission reversed Daniel Archie's termination and reinstated Archie to his position with the Douglas County Youth Center (DCYC). On appeal, Douglas County asserts that Archie's reinstatement was arbitrary and capricious and unsupported by sufficient, relevant evidence. Additionally, Douglas County asserts that the district court should have found error in the Commission's failure to make express findings and in its consideration of information from outside the record.

- 1 -

Upon our review, we agree that the district court's order was arbitrary, capricious, and unsupported by sufficient, relevant evidence. Accordingly, we reverse the district court's order affirming Archie's reinstatement and remand with directions to re-impose Archie's termination.

## II. BACKGROUND

In 2003, Archie applied to DCYC for a position as a juvenile detention specialist. Archie's application was dated February 4, 2003. On the application, Archie indicated that he had previously been employed by Omaha Public Schools (OPS) as a teacher and coach at South High School. Archie listed his reason for leaving his OPS job as "spend time w/ kids." DCYC hired Archie for the juvenile detention specialist position.

In May 2004, Archie applied for another position within DCYC as a physical education teacher. On the application, Archie this time listed his reason for leaving his earlier OPS job as "family." DCYC hired Archie for the physical education teacher position.

Archie continued his employment with DCYC until August 2014. At that time, the superintendent of DCYC received a telephone call from a woman claiming to be the mother of a former South High School student. The mother told the superintendent that Archie had conducted an inappropriate sexual relationship with her daughter while the daughter was a student. At the time, Archie was a physical education teacher at South High School.

As a result of the information the superintendent received from the mother, DCYC issued a notice of pre-disciplinary hearing to Archie. The notice charged Archie with one violation of the DCYC Code of Ethics and two violations of the Civil Service Commission Personnel Policy Manual. The Code of Ethics violation was later dismissed and is not at issue on appeal. With respect to the two violations of the Personnel Policy Manual, the notice of pre-disciplinary hearing charged Archie under the following subsections of Article 22, § 5:

Cause for discipline includes but is not limited to the following:

. . . .

13. Falsification, fraud or intentional omission of required information on the employment application/resume.

. . . .

19. Has engaged in criminal, dishonest, immoral, or notoriously disgraceful conduct, which is prejudicial to the County or to [the] County's reputation.

Although the notice mistakenly stated that Archie had violated Article 22, § 5(18) of the Personnel Policy Manual, it is obvious and the parties agree that this was a typographical error and that DCYC intended to allege a violation of Article 22, § 5(19) as set forth above.

After issuing the notice to Archie, DCYC conducted a pre-disciplinary hearing which is not contained in the record before us. Following the hearing, DCYC issued to Archie a notice of termination. The notice stated that DCYC had found that Archie violated Article 22, § 5(13) and (19). In support of its finding that Archie violated Article 22, § 5(19), DCYC cited to an audio recording of a telephone conversation between Archie and the former student with whom he had the relationship. DCYC found that during the recorded telephone call, Archie had not disputed that the student was 17 years old when the relationship started. DCYC also determined that Archie knew the student had become pregnant around the time of her graduation and had undergone an

abortion. DCYC concluded, "Your actions do not appear to be criminal, however, your actions clearly meet the definition of being dishonest, immoral, or notoriously disgraceful, which is prejudicial to the county or to the county's reputation."

Second, DCYC found that Archie had violated Article 22, § 5(13) of the Personnel Policy Manual for falsification, fraud or intentional omission of information on his employment applications. DCYC stated:

> You informed the Disciplinary Board that you chose to resign from Omaha South at the time because you had a son at the school, you had a daughter who would be coming to the school and you wanted to spare them further embarrassment and a media frenzy. You informed the Board that rumors were all over the school regarding you and the female student. Yet, at the time of your DCYC employment application, none of the circumstances surrounding the inappropriate relationship or pending investigation were disclosed by you.
>
> Clearly your decision to resign was a result of the investigation into an inappropriate relationship that you were having with a female student or former student. . . .
>
> . . . Your application clearly contains willful misrepresentation and the information that you provided was not true and complete to the best of your knowledge and belief.

Archie appealed his termination to the Commission. A hearing was held before the Commission on November 6, 2014.

At the hearing before the Commission, Douglas County called the student with whom Archie was alleged to have had the relationship to testify. According to the student, she engaged in a sexual relationship with Archie during the time she attended South High School around 2001. The former student could not recall exactly how old or what grade she was in when the relationship started, but testified that she was certain she was a student when it began. The former student also testified that she refused to cooperate with the investigation into Archie's behavior because she was "under [Archie's] control" and wanted to protect Archie because she thought they were in love. The student testified that she believed the reason Archie was never disciplined was because of her unwillingness to cooperate with the investigation.

The student's mother also testified at the hearing. According to the mother, the student was 16 years old when the relationship with Archie began. The mother testified that she found out about the relationship after receiving a call from the school. According to the student's mother, she did not reach out to DCYC regarding the relationship sooner because it was not until August 2014 that the student "finally woke up." The mother testified that "the light bulb went off" and the student was then willing to cooperate. The student's mother also testified that at some point in time while the relationship was going on, she had discovered Archie hiding in a shower at the former student's father's house.

Archie also testified at the hearing. The attorney for Douglas County asked Archie, "So are you denying that you had a relationship with [the former student] at all?" Archie responded, "Absolutely." Archie testified that he resigned from OPS because "the way things were going on at Omaha Public Schools nobody really wanted to listen to what I had to say" regarding the alleged relationship. When pressed, Archie admitted that his reason for resigning was broader:

- 3 -

[Archie]: . . . It was the situation. The situation with OPS not listening to me. Trying to understand what was going on. Again all the talking was being done pretty much by the [student's] mother . . . .

[Douglas County Attorney]: But so, you're saying the whole situation - so were the rumors a factor?

A: Were the rumors a factor?

Q: In this whole situation is what you're saying?

A: Of course.

Q: So the whole situation overall did cause your resignation from OPS?

A: The whole situation overall?

Q: Yes.

A: Yes.

On cross-examination by his own attorney, Archie testified that he resigned because he "didn't want to expose [his] children or basically make these rumors more exaggerated." Also during cross-examination, Archie admitted that he did engage in sexual activity with the student after she graduated, but continued to deny he engaged in sexual activity with her while she was a student.

Archie testified that he was never formally disciplined for sexual misconduct by OPS due to a lack of evidence. Instead, OPS issued Archie a notice stating that if it did not receive Archie's resignation by January 9, 2003, it intended to continue investigating him for lying about his whereabouts. Archie submitted his resignation and it appears that OPS discontinued the disciplinary proceedings against him.

Archie testified that at the time of his 2003 application to DCYC for the position of juvenile detention specialist, there was no ongoing investigation. Archie testified that after he began working for DCYC and before his 2004 application for the position of physical education teacher with DCYC, the Department of Education investigated him and issued him a reprimand for lying about his whereabouts on October 10, 2002 when questioned during an investigation regarding contact with a female student. Archie testified that he did not disclose his sexual relationship with the student because the DCYC applications did not require him to disclose it.

The superintendent of DCYC also testified at the hearing before the Commission. According to the superintendent, Archie was terminated for misrepresenting his reason for leaving OPS on his employment applications and because the information revealed in the audio clip of the telephone call between Archie and the student was "very disturbing." The superintendent testified that DCYC would not have hired Archie if it had been aware of the "whole situation at South High School." The superintendent also testified that DCYC did not discover Archie's reprimand by the Department of Education, despite Archie including a copy of his teaching certificate with his 2004 application.

At the end of the superintendent's testimony, the Commission was permitted to ask its own questions. The Commission asked the superintendent if DCYC fell under the guidelines of the Prison Rape Elimination Act (PREA). The superintendent answered that DCYC was, in fact, covered by PREA.

In addition to its witnesses, Douglas County introduced various exhibits into evidence at the hearing, including copies of both Archie's 2003 and 2004 employment applications and the audio taped telephone conversation.

The audio tape exhibit consists of approximately 4 1/2 minutes of a telephone conversation between Archie and the student. In response to a question from the Commission, Douglas County's attorney stated that the conversation was recorded around August 9, 2014. On the tape, the former student can be heard stating that Archie "didn't have to help [her] by sleeping with [her]" to which Archie responds, "Well, all that stuff just came with the situation." Also on the tape, the former student asserts that she twice became pregnant by Archie and underwent abortions, to which Archie responds, "I didn't say it wasn't hurtful. If it wasn't hurtful, I wouldn't have apologized, but there's nothing you can do about it. What do you want me to do about it? There's nothing I can do about it." Lastly, Archie can be heard stating, "It was my fault because I had the power to fix it in the beginning. . . . I can confess to that. And you know what, even being 17, you're still of legal age. Only thing I can lose is my teaching certificate."

Following Douglas County's presentation of evidence, Archie called the former detention manager at DCYC to testify. The detention manager testified that he had been involved in hiring Archie and had been aware of a rumor that Archie "resigned from South High due to something with a former student." The detention manager testified that he did not ask Archie any further questions regarding this rumor because "there was nothing on [his] application indicating that that would be a problem." Archie then rested his case.

Following the parties' closing arguments, the Commission decided to delay consideration of Archie's termination "pending a review of PREA and any other similar applicable rules and regulations."

The Commission reconvened on November 25, 2014. The record of that hearing reflects that the Commission reviewed two documents relating to PREA: one pertaining to PREA's juvenile facility standards and one involving frequently asked questions. Neither document appears in the record before us. Following receipt of these documents, the Commission held an executive session to discuss the PREA information. The executive session was not reported.

Following its return to regular session, the Commission voted unanimously to reverse Archie's termination. The Commission stated, "[h]owever, nothing here is intending to preclude any future action taken by [DCYC] and applying appropriate PREA standards."

Following the Commission's entry of its decision to reverse Archie's termination, Douglas County made a motion that the Commission "include their findings" in its order. The Commission denied Douglas County's motion to include specific findings. The written order issued by the Commission recounted the procedural background of the case and then stated the Commission's decision as follows:

> [T]he decision of the . . . Commission is to reverse the termination of . . . Archie and to reinstate him in whole in terms of pay and benefits back to his date of termination. Nothing in this order is intended to preclude any future actions to be taken by [DCYC] in applying appropriate PREA standards.

The Commission's order did not make any additional findings.

Douglas County filed a petition in error in the district court, alleging seven errors. Specifically, Douglas County alleged that (1) the Commission erred in finding Archie did not lie on his employment applications because its request to review PREA indicated its belief that Archie did engage in a sexual relationship with the student; (2) the Commission unlawfully expanded the record by relying on information regarding PREA; (3) the Commission erred in ignoring Archie's admission at the hearing that he resigned from OPS due to the whole situation at South High School, not just to spend time with his children; (4) the Commission erred in not finding Archie's ongoing dishonesty on his 2004 application for the physical education teacher position to be a basis for termination; (5) the Commission erred by not imposing an intermediate level of discipline rather than reinstating Archie in full; (6) the Commission exceeded its statutory authority by reinstating Archie when the evidence did not reveal that Douglas County dismissed Archie with any improper motive, such as political, racial, or religious discrimination; and (7) the Commission's order reinstating Archie was arbitrary and capricious because it was taken in disregard of the facts and circumstances of the case.

The district court held a hearing on Douglas County's petition in error. At the hearing, the court received into evidence the "bill of exceptions" of the proceedings before the Commission and the exhibits admitted at that hearing. The court also heard argument from Douglas County, Archie, and the Commission.

The district court dismissed Douglas County's petition in error and affirmed the Commission's decision reinstating Archie. The district court stated its belief that "there was sufficient and relevant evidence that the [C]ommission could have found . . . that would support and substantiate its reinstatement of . . . Archie to his position." The district court did not elaborate, nor does its written order reveal, what it believed the sufficient, relevant evidence supporting reinstatement was.

Douglas County appeals the district court's dismissal of its petition in error.

## III. ASSIGNMENTS OF ERROR

Restated and renumbered, Douglas County asserts that (1) the district court's order reinstating Archie is arbitrary, capricious, and unsupported by sufficient, relevant evidence; (2) the district court erred in failing to find that the Commission's lack of express findings was erroneous; and (3) the district court erred in failing to find error in the Commission's consideration of evidence from outside the record.

## IV. STANDARD OF REVIEW

In reviewing an administrative agency decision on a petition in error, both the district court and the appellate court review the decision to determine whether the agency acted within its jurisdiction and whether sufficient, relevant evidence supports the decision of the agency. *Fleming v. Civil Serv. Comm'n of Douglas Cnty.*, 280 Neb. 1014, 792 N.W.2d 871 (2011). The evidence is sufficient, as a matter of law, if an administrative tribunal could reasonably find the facts as it did on the basis of the testimony and exhibits contained in the record before it. *Id.* In addition, the administrative action must not be arbitrary or capricious, meaning it must not be taken in disregard of the facts or circumstances of the case, without some basis which would lead a reasonable and honest person to the same conclusion. *Id.*

The reviewing court in an error proceeding is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact. *Pierce v. Douglas Cnty. Civil Serv. Comm'n*, 275 Neb. 722, 748 N.W.2d 660 (2008). On questions of law, the appellate court reaches a conclusion independent of the court below. *Id.*

## V. ANALYSIS

### 1. BASIS FOR DISTRICT COURT'S DECISION

Douglas County argues that the district court's decision affirming Archie's reinstatement was arbitrary, capricious, and unsupported by sufficient, relevant evidence. We agree that in light of all the evidence, Archie's conduct violated Article 22, § 5(13) and (19) of the Personnel Policy Manual, thereby constituting a basis for his termination. The district court's decision affirming the Commission's reinstatement of Archie is arbitrary, capricious, and unsupported by sufficient, relevant evidence.

DCYC's notice of termination reveals that Archie was terminated for two violations of the Personnel Policy Manual, which we will review in turn.

### (a) Conduct Prejudicial to County

First, the notice of termination states that Archie was terminated for violating Article 22, § 5(19) which provides that an employee can be disciplined for "engag[ing] in criminal, dishonest, immoral, or notoriously disgraceful conduct, which is prejudicial to the County or to [the] County's reputation." The basis for this prong of Archie's termination was the inappropriate sexual relationship he was alleged to have had with the student at South High School.

Reviewing the record, it is apparent that the evidence was legally insufficient to support the district court's conclusion that Archie's conduct was not a violation of Article 22, § 5(19). The student and her mother both testified that the sexual relationship started while the student was in high school. On the audio tape, Archie admitted that the student was 17 at the time they had sex when he said, "[E]ven being 17, you're still of legal age. Only thing I can lose is my teaching certificate." Archie's contradictory statements at the hearing before the Commission, first that he never had a relationship with the student, then that their relationship started only after she had graduated, cannot reasonably be accepted in light of the rest of the evidence, including Archie's own admission that the student was 17 years old when their sexual relationship began and that he could lose his teaching certificate because of the relationship.

Archie also conceded the inappropriate nature of his conduct, stating that he could lose his teaching certificate for his behavior and admitting that his actions were "hurtful" to the student. Archie was in a position of authority and trust with respect to the students at South High School. Archie abused his authority by engaging in sexual relations with one of those students. As an institution that also works with children, DCYC has an interest in portraying an image of responsibility, trust, and confidence to the community. DCYC's reputation would undoubtedly be harmed by employing a person who had previously engaged in inappropriate sexual behavior with a student he was supervising.

Reviewing the evidence, we find that that no reasonable and honest person could reach the conclusion of the district court that Archie's behavior was not a violation of Article 22, § 5(19).

- 7 -

The district court's decision is not supported by the record and evidence, especially the student and her mother's testimony, and Archie's own statements during the recorded telephone call. Accordingly, the district court's decision that Archie's termination was not warranted under Article 22, § 5(19) is arbitrary, capricious, and unsupported by sufficient, relevant evidence.

(b) Misrepresentation on Employment Applications

The second violation for which Archie was terminated was Article 22, § 5(13), which prohibits "[f]alsification, fraud or intentional omission of required information on the employment application/resume." Reviewing the record, we conclude that the evidence was legally insufficient to support the district court's conclusion that Archie's conduct was not a violation of Article 22, § 5(13).

The evidence presented at the hearing before the Commission demonstrated that on his initial 2003 employment application Archie listed his reason for leaving his OPS job as "spend time w/kids" and on his 2004 application for the physical education teacher job as "family." According to the notice of termination, Archie told DCYC his real reason for leaving his OPS job was "to spare [his children] further embarrassment and a media frenzy" because "rumors were all over the school regarding [Archie] and the female student." Similarly, at the hearing before the Commission, Archie testified that he left OPS because he felt OPS was not listening to his version of events, because of the rumors, and because of "[t]he whole situation overall" pertaining to his relationship with the student. The evidence also demonstrated that had Archie not resigned when he did, he would have been subject to continuing disciplinary proceedings for lying about his whereabouts on October 10, 2002 when questioned during an investigation regarding contact with a female student. All of this demonstrates that Archie's reason for leaving OPS was broader than just "family" or "spend[ing] time [with his] kids."

Archie argues that DCYC based its decision on its mistaken belief that Archie was under active investigation and on administrative leave at the time he applied for the DCYC jobs. Archie points out that OPS had already closed its investigation and that he had resigned from OPS before applying to DCYC. While we agree that the notice of termination indicates that DCYC believed that Archie was under active investigation at the time he applied to DCYC, the exact dates of the investigation are immaterial to the larger question of whether Archie's statements constitute "[f]alsification, fraud or intentional omission." Regardless of the timing of the investigations by both OPS and the Department of Education, the record reveals that Archie's failure to mention the situation with the student as a reason for leaving his OPS job was nevertheless an "intentional omission of required information," as prohibited by Article 22, § 5(13).

Archie also argues that he should not have been terminated from his DCYC job because DCYC was aware of the rumors regarding his relationship with the South High School student at the time it hired him and because DCYC failed to adequately investigate his teaching certificate in order to discover the reprimand from the Department of Education. In support of this argument, Archie points to the former detention manager's testimony that he had heard a rumor that Archie had been fired due to something involving a student prior to hiring Archie but that he did not ask Archie about the rumor prior to hiring him. Archie also emphasizes the superintendent's admission that he did not investigate Archie's teaching license to determine whether or not Archie had received a reprimand. As with Archie's arguments regarding the timing of the investigations into

his conduct, this argument is immaterial to the determinative question. Regardless of what knowledge DCYC employees may have had or their decision not to investigate the status of Archie's teaching license, such details do not change the fact that Archie intentionally omitted the situation with the student as the true reason for leaving his previous job on his employment applications.

The evidence was legally insufficient to support the district court's conclusion that Archie's misrepresentation on his employment applications was not a violation of Article 22, § 5(13). Accordingly, the district court's determination that Archie's termination was not warranted under Article 22, § 5(13) is arbitrary, capricious, and unsupported by sufficient, relevant evidence.

We conclude that no reasonable person could determine that Archie's termination was not warranted under both Article 22, § 5(13) and (19) for Archie's sexual relationship with a student and his failure to disclose the incident as his reason for leaving his former job. We reverse the district court's order affirming the Commission's decision to reinstate Archie.

## 2. FAILURE TO MAKE FINDINGS

Douglas County argues that the Commission's failure to make express findings in its order reinstating Archie violated the Commission's own rules and was therefore reversible error. In support of its argument, Douglas County points to various statutes and provisions of the Commission's Personnel Policy Manual referencing the Commission's "finding" and "findings." However, Douglas County did not assign the Commission's failure to make express findings as error in its original petition in error to the district court. Where a cause has been appealed to a higher appellate court from a district court exercising appellate jurisdiction, only issues properly presented to and passed upon by the district court may be raised on appeal to the higher court. *Miller v. Horton*, 253 Neb. 1009, 574 N.W.2d 112 (1998); see, also, *Bickford v. Bd. of Educ. of Sch. Dist. No. 82 of Hall Cnty.*, 214 Neb. 642, 336 N.W.2d 73 (1983) (stating that a petition in error must set forth the specific errors complained of and noting that this requirement has been strictly enforced). Because Douglas County did not present this assignment of error to the district court in its petition in error, it has failed to preserve this issue for our review.

## 3. CONSIDERATION OF EVIDENCE FROM OUTSIDE RECORD

Lastly, Douglas County argues that the Commission's decision to review information pertaining to PREA prior to rendering its decision exceeded the Commission's statutory review authority and improperly expanded the record by considering evidence that was not presented or argued by either party. Given our disposition of Douglas County's first assignment of error requiring reversal, we need not and do not address Douglas County's argument with respect to the extra-record PREA information. See *Pierce v. Douglas Cnty. Civil Serv. Comm'n*, 275 Neb. 722, 748 N.W.2d 660 (2008) (declining to reach the merits of appellant's additional argument in favor of reversal where the court found reversal warranted on other grounds).

## VI. CONCLUSION

We conclude that the district court's decision was arbitrary, capricious, and unsupported by sufficient, relevant evidence. Accordingly, we reverse the district court's order affirming Archie's reinstatement and remand with directions to re-impose Archie's termination.

REVERSED AND REMANDED WITH DIRECTIONS.

BISHOP, Judge, dissenting.

The standard of review for both the district court and this court is limited to determining whether there is sufficient, relevant evidence to support the decision of the administrative agency in this case, the Douglas County Civil Service Commission (Commission). Further, the Commission's action must not be arbitrary or capricious. Because the record before us does in fact contain sufficient, relevant evidence to support the Commission's decision to reinstate Archie to his job, and because its decision is not arbitrary or capricious in that a reasonable person could reach the same conclusion, I would affirm the district court's decision which affirmed the Commission's decision.

I first note that the Commission's Personnel Policy Manual was received as an exhibit, and it encompasses powers and duties assigned to the Commission by Nebraska law pursuant to Neb. Rev. Stat. §§ 23-2501 to 23-2516 (Reissue 2012). Those statutes reveal that the purpose of the civil service system statutes (for counties of more than 300,000 inhabitants) "is to guarantee to all citizens a fair and equal opportunity for employment in the county offices governed by sections 23-2501 to 23-2516, to establish conditions of employment and to promote economy and efficiency in such offices." § 23-2501. The Commission is established in the statutes to accomplish that purpose. My point here is that this is a tribunal designed specifically to deal with employment-related matters within its jurisdiction, and therefore, its decisions warrant considerable deference. And our standard of review requires that we give it that deference. When any county employee is discharged, suspended, or demoted by a department head's written order, that employee may appeal such a decision to the Commission. § 23-2510. The Commission has the authority to affirm, modify or revoke the order appealed from, and its decision is binding on all parties concerned. § 23-2511.

In the present matter, after its hearing on November 6, 2014, the Commission reversed the Douglas County Youth Center's (DCYC) decision to terminate Archie's employment. As noted previously, the district court's and this court's standard of review requires giving the Commission considerable deference by limiting our review to whether or not there is sufficient, relevant evidence to support the Commission's decision, and to ensure its decision is not arbitrary or capricious. Contrary to that limited standard of review, the majority instead seems to rely on its own interpretation of some of the evidence which the majority suggests supports DCYC's decision to terminate Archie's employment. However, our standard of review does not permit us to reverse the Commission's decision simply because there is evidence that may support a different outcome. Rather, like the district court, our role is only to determine whether there is sufficient evidence to support the Commission's decision. As discussed next, I agree with the district court that there is sufficient, relevant evidence from the November 6 hearing to support the Commission's decision.

- 10 -

BACKGROUND

The former student at issue graduated from Omaha Public Schools (OPS) in 2001; she turned 18 in August after she graduated. A letter to Archie dated January 3, 2003, from OPS Assistant Superintendent Sandra Hodges, refers to an investigation conducted more than a year after the student had graduated. It states:

On November 15, 2002, subsequent to investigation of allegations of misconduct made against you that you had engaged in a sexual relationship with a former student within two years of that student's enrollment in the Omaha Public Schools, I recommended that your contract with the Omaha Public Schools be cancelled for engaging in such a relationship and for lying to me as to your whereabouts on October 10, 2002, the date it was alleged you were found with the student in a potentially compromising sexual situation.

Based upon advice from legal counsel, after their review of Omaha Public School files and witness interviews, that there is insufficient evidence upon which the Board could rely that you were in a compromising sexual situation on October 10, 2002, I am withdrawing my recommendation that your contract be cancelled for said action.

However, the fact remains that there is clearly admissible and persuasive evidence that you did lie about your whereabouts during the time period in question. Accordingly, the administration will proceed with the hearing you requested before the Board of Education as previously scheduled on January 9, 2003, unless a letter of resignation has been received from you prior to such date.

Notably, the letter does not indicate that the investigation involved events occurring while the student was in high school; rather, the investigation pertained to Archie possibly engaging in a sexual relationship with a former student within two years of that student's enrollment and lying about his whereabouts on October 10, 2002, the date it was alleged he was found with the former student in a potentially compromising sexual situation. However, after investigating, OPS concluded there was insufficient evidence to pursue cancelling Archie's contract based upon the relationship with a former student, and specifically "that there is insufficient evidence upon which the Board could rely that you were in a compromising sexual situation on October 10, 2002." However, OPS planned to move forward with a hearing on whether to cancel his contract based on him lying about his whereabouts on October 10.

As to that October 2002 incident, the student's mother testified at the hearing before the Commission:

[D]uring the time that there was questioning and there was an awareness of a possible relationship with [my daughter] and [Archie], . . . I believe in October - I can't remember the year, but sometime in October I had went - [my daughter] was at her father's house and I went to her father's house to talk to her about this situation because I wasn't going to let it go because I knew that there was a relationship going on. And upon entering her father's house I knew that there was something not quite right, so I pushed passed [my daughter] and went to her father's bathroom and there stood standing [Archie] hiding in the shower behind the curtain.

- 11 -

After finding Archie in the shower, the mother reported the incident to the school district, and she took a polygraph test to see if she was being truthful. Archie testified that he was put on administrative leave from OPS in October 2002. When the mother was later asked to recall when she took the polygraph, she stated that "if [her] memory serve[d] [her] correctly," she believed it was in 1999 when her daughter was a junior. However, this testimony is not consistent with the dates contained in the OPS document, nor with the mother's earlier testimony and Archie's testimony.

Archie testified that when presented with the option of moving forward with a hearing on whether he lied about where he was on October 10, 2002, or resigning, he resigned. Although he agreed it was "drastic" to lose a job over telling somebody he was in a different place than he was, he did not want his children exposed to rumors since his children were or would be attending South High. His resignation occurred before he applied to the DCYC for the juvenile detention specialist position on February 4, 2003.

A former DCYC detention manager testified that he may have been involved in the interview process when Archie applied for the juvenile detention specialist position, but not when he applied for the later position as a physical education teacher. He had known Archie for 3 to 4 years before Archie applied for the juvenile detention specialist position because he had been a basketball official at South High when Archie was the head coach there. He recalled asking for "Coach Archie" when he was at South High for a game and was told he had resigned, and there was a "rumor" Archie "resigned due to something that happened with a former student." The detention manager later ran into Archie and told him about the juvenile detention specialist position because he thought "that would be an excellent position for him because he likes to deal with kids." This former detention manager said he "made the decision to hire Archie," and that he did tell the superintendent "that Archie resigned from South High due to something with a former student. That was it." He went on to say, "There were just rumors that he resigned from South High over something involved with an ex student. I left it at that. I didn't question him any way, shape or form." He recalled the superintendent saying something like, "Give him a shot," but he could not remember the exact words. The superintendent testified that he did not recall having any conversations with the former detention manager regarding hiring Archie.

When the former student testified before the Commission in November 2014, more than 13 years had passed since she graduated; she was 31 years old at the time of the hearing. The former student could not remember if she was 16 or 17, or a junior or a senior, but she "believe[d] [she] was a junior," when her relationship with Archie began. Archie testified that he did not meet the student until the basketball season of her senior year in 2001 when the student wanted to be a team manager. The former student recalled speaking with people from OPS and from the Department of Education, and that she had denied there was any sexual conduct or behavior between Archie and her when questioned at that time. Notably, based upon the OPS and Department of Education documents, it would appear these interviews would have occurred in the fall of 2002 when the OPS investigation took place or later in 2003 when the Department of Education investigation took place; this timeframe was at least 1½ to 2 years after the former student graduated from high school. The former student said it was her belief the school dropped the investigation as to their relationship "because [she] wasn't cooperating yet."

The former student also acknowledged that she went to great efforts to keep in contact with Archie over the past decade. In fact, in the year prior to the November 2014 hearing, she went to his place of employment and waited in the car for him to come out. She also wanted Archie to tell her where his new place of residence was because "now that [she was] older [she] realize[d] the damage . . . [she] underst[ood] a lot more now than back then." She added, "I didn't want to believe you know I wasted all these years and you know the lies, the manipulations so I was questioning him. Because I didn't want to believe it." She acknowledged that Archie did not want to tell her where he lived, and that she waited for him in the parking lot where he worked more than once. She admitted she contacted Archie in August 2014 during the evening (even though she was apparently romantically involved with someone else) and she agreed that she wanted Archie to be with her.

Archie testified, "After [the student] got out of high school she just kind of went through periods of you know she would call and she was still going through a phase with her mom and I would help her out here and there, you know, whenever she needed some help . . . and [the student] was a very needy individual." They would have long periods of "not being around each other," and then the student would call. He disagreed with the student's representation that they "were contacting each other," rather, "it was never about [Archie] having to call her and talk to her. Usually when it was a long period of when [they] didn't talk to each other, she called [him]." Archie acknowledged that he "always wondered how she was doing and if she had rekindled her relationship with her mom," and that he had always promised her, when he started helping her, that he would do what he could to help her because "you're not supposed to fear your mom you're supposed to respect your mom and she's supposed to respect you." Archie specifically denied engaging in sexual activity with the student when she was in high school, but did admit to engaging in sexual activity "[a]t some time after she graduated."

According to Archie, the former student was determined to be with him. However, he and the student would not talk for years, and the majority of the contact between them occurred in the most recent five years. "But within the last year" it was getting "a lot more hectic because you know she was determined . . . she was going to do whatever it took to be with me." Archie said in July 2014, he tried to prevent the former student from having contact with him. The former student was not accepting that Archie just wanted to be friends; he stopped talking to her and stopped answering his phone.

In August 2014, the former student forwarded an audio recording to her mother, who in turn contacted the Board of Education and Archie's employer. The audio recording is purported to be a clip from a conversation between the former student and Archie on or about August 9, 2014. According to Archie, the approximately 4½ minutes of audio clip was excerpted from a conversation that lasted about 30 minutes, and "it would help out tremendously" to hear the entire conversation.

By the time this audio recording was given to DCYC in 2014, Archie had been working for DCYC for 11 years. The superintendent of DCYC testified that Archie was a good employee. The former detention manager for DCYC who had hired Archie testified that Archie was "very professional" and had an "excellent work relationship with not only the kids but the staff, supervisor. He was a model employee." The detention manager stated that Archie's direct

supervisor indicated that he wished all his teachers were like Archie, that Archie "was above and beyond."

Despite Archie being a "model employee," when the former student's mother (not the former student herself) contacted DCYC with allegations of events from a dozen years prior, along with the August 2014 audio recording alleged to support the old allegations, DCYC terminated Archie's employment claiming violations of discipline policy provisions in that there was an "intentional omission of required information" on his employment application and that he had engaged in "criminal, dishonest, immoral, or notoriously disgraceful conduct, which is prejudicial to the County or to [the] County's reputation." By reversing the DCYC's decision, the Commission necessarily determined that Archie did not violate these two discipline policy provisions. As discussed next, the evidence supports the Commission's decision on both counts.

ANALYSIS

*Employment Applications.*

Article 22, Section 5(13) of the personnel policy sets forth as a cause for disciplinary action: "Falsification, fraud or intentional omission of required information on the employment application/resume." The key examination for the Commission's consideration was whether Archie "intentionally" omitted "required" information. While writing "spend time w/ kids" (February 2003 application) or "Family" (May 2004 application) as his reason for leaving OPS was not the full story, it was not argued that these descriptions were false or fraudulent. The question is what was Archie specifically "required" to set forth on the application form to explain his resignation from OPS that he, arguably, "intentionally" omitted.

Both applications completed by Archie were form documents with the following notice at the top of the form: "**NOTICE TO EMPLOYEES:** Please note that portions of your application may be deemed a public record pursuant to Neb. Rev. Stat. § 84-712 and for that reason may be made available to the public for viewing." This notice would certainly give an applicant pause about providing personal details on the application. In fact, when asked if there have been other instances where employees write "personal" as a reason for leaving (presumably a former job), the superintendent testified that he was "sure that's happened." And when asked if he pursues what "personal" means, and that it "could mean a lot of things," the superintendent agreed and said "when it says - when you say to spend time with family or kids - that should be fairly clear, if it's personal I think." The superintendent further indicated that "[w]e do ask in an interview, what does that mean? And then it might go into a number of situations. It might have been something that caused them to relocate or whatever the case may be."

Clearly, if writing "personal" on an application as a reason for leaving a former job flags further inquiry during an interview, it is difficult to imagine why "spend time w/kids" or "Family" would not similarly trigger such additional exploration. Notably, the superintendent did not testify that indicating "personal" was an insufficient explanation to set forth on an application, nor did he say that writing such a non-descriptive explanation would constitute an intentional omission of required information. According to the superintendent, when "personal" is indicated on an application, such a response is usually followed up with questions during an interview. The superintendent nevertheless held Archie's application response to a different standard. He expected Archie to describe on his public record application "the whole situation," apparently all

in the very limited space provided on the application forms. The February 2003 application had a space less than 2 inches wide and ½ inch tall; the May 2004 application had a single line, only 1½ inches wide. It is not indicated on the form that further explanation should be provided on additional sheets of paper.

Importantly, in this case, the former detention manager testified that he was the one who made the decision to hire Archie, and that he did tell the superintendent "that Archie resigned from South High due to something with a former student. That was it." He went on to say, "There were just rumors that he resigned from South High over something involved with an ex student. I left it at that. I didn't question him any way, shape or form." He recalled the superintendent saying something like, "Give him a shot," but he could not remember the exact words.

Since writing "personal" as an explanation for leaving a former job is not an intentional omission of required information, it seems incongruous that writing "spend time w/kids" is somehow so substantially different from writing "personal" that it constitutes an intentional omission of required information warranting termination after 11 years as a "model employee." Archie did not intentionally omit any information required by the application. By the superintendent's own acknowledgement, applicants have given explanations as generic as "personal," and when they do so, they are often asked for more information during their interview. Accordingly, based upon the record as described thus far, there is sufficient evidence to support the Commission's decision reversing the DCYC on this alleged violation.

But there is more. The Commission's decision to reverse the DCYC's decision is also supported by evidence that the DCYC's decision was based upon erroneous findings. The DCYC determined that "none of the circumstances surrounding the inappropriate relationship or pending investigation were disclosed by you" and that Archie's "application clearly contains willful misrepresentation and the information [Archie] provided was not true and complete to the best of [his] knowledge and belief." It appears that the DCYC was persuaded that Archie had engaged in a sexual relationship with a student while the student was actively enrolled at South High, stating, "Clearly the encounters took place during her senior year in high school or you would have stated, in the audio clip, that the sexual encounters occurred two years after the girl had graduated." Archie denied having a sexual relationship with the former student while she was still in high school, but seemed to acquiesce in the audio recording that she may have been 17, which as noted previously, was the former student's age until August after her graduation. It is unclear why the DCYC concluded that Archie would have had to admit to sexual encounters occurring "two years after the girl had graduated" in order to dispel the notion that the relationship commenced while she was still in high school.

The DCYC was further convinced that an active investigation was underway at the time Archie applied to the DCYC in February 2003, stating, "Clearly, you were under investigation at the time that you resigned," and "You were on paid administrative leave at the time that you submitted the first application." This determination was not accurate. By the time Archie resigned in January 2003, he was no longer under investigation or on administrative leave. OPS had completed its investigation and concluded there was insufficient evidence to support the relationship allegations. The only issue that remained was whether Archie wanted to proceed to hearing on the claim that he had been dishonest about his whereabouts in October 2002. At the

time of each of Archie's applications in February 2003 and May 2004, he was not on administrative leave, nor was there a pending investigation, either by OPS or the Department of Education.

The majority seems to acknowledge that the DCYC's decision to terminate Archie's employment was in part based on DCYC's erroneous understanding that Archie was under active investigation at the time he applied to DCYC. Nevertheless, the majority concludes that

> While we agree that the notice of termination indicates that DCYC believed that Archie was under active investigation at the time he applied to DCYC, the exact dates of the investigation are immaterial to the larger question of whether Archie's statements constitute '[f]alsification, fraud or intentional omission.' Regardless of the timing of the investigations by both OPS and the Department of Education, the record reveals that Archie's failure to mention the situation with the student as a reason for leaving his OPS job was nevertheless an 'intentional omission of required information,' as prohibited by Article 22, § 5 (13).

It is unclear what "situation with the student" the majority suggests Archie was required to disclose by the time of his first application in February 2003 or his later one in May 2004. The allegation that Archie engaged in a compromising sexual situation on October 10, 2002, was determined by OPS to be unsupported by evidence. As to the allegation that Archie lied about his whereabouts on that day, this was a matter that could have been inquired about during the interview, especially since it was evident that Archie's separation from OPS occurred in the middle of a school year and DCYC had knowledge of the "rumors." The fact that Archie wrote "spend time w/kids" or "Family" on his applications as reasons for leaving OPS does not mean he intentionally omitted "required" information on the public record form; his personal reasons given were no different than had he written "personal," which the superintendent indicated simply prompts further inquiry during an interview.

Since there is sufficient, relevant evidence in the record to support that Archie did not intentionally omit required information on his 2003 and 2004 applications, the Commission's decision should stand.

*Conduct Prejudicial to County.*

Article 22, Section 5(19) of the personnel policy sets forth as a cause for disciplinary action: "Has engaged in criminal, immoral, or notoriously disgraceful conduct, which is prejudicial to the County or to County's reputation." No one suggests that Archie engaged in criminal conduct. That leaves immoral or notoriously disgraceful conduct, either of which must also be prejudicial to the County. To the extent Archie engaged in a sexual relationship with the former student after she graduated, but was still 17, and may have been sexually involved with her within the 2-year period following her graduation, which was apparently prohibited by OPS policy, such conduct could be viewed as immoral or disgraceful. However, it is difficult to see how those behaviors were prejudicial to the County when Archie did not apply for a position with DCYC until after the investigation was closed and his resignation from OPS had been accepted. The questionable conduct had already occurred, was perhaps immoral or disgraceful conduct prejudicial to OPS, and Archie paid a steep price for that conduct by tendering his resignation. Archie's conduct prior to his employment with the County, whatever it is believed to be, had no bearing on his later

employment with the County. In fact, he was considered a "model employee." Accordingly, the evidence sufficiently supports the Commission's decision declining to terminate Archie's employment based upon an alleged violation of this provision.

As further support that pre-employment conduct is not what this disciplinary provision contemplates, it is important to read the provision in context with the purpose of Article 22, which is the "Discipline Policy." Article 22, Section 2, states: "The purpose of a disciplinary policy is to acquaint all employees with the rules that serve to guide their conduct in order that they can be contributing team members helping to achieve the objectives of better and more efficient service to the citizens of Douglas County." In reviewing the 33 grounds set forth in Article 22, Section 5, as a possible basis for disciplinary action, it is clear that the provisions relate largely to performance of duties, behaviors on the job, activities at the workplace or other property of the County, actions towards coworkers, and possession of unauthorized or illegal items on County property. Notably, these various grounds, other than the one pertaining to the employment application already discussed, all relate to conduct while employed by the County. As the purpose of the disciplinary policy states, the rules are to guide the employees' conduct so they can be contributing team members. The rules are not designed to judge pre-employment behaviors from more than a dozen years prior.

Nevertheless, the DCYC and the majority appear to focus more on whether or not the sexual relationship with the former student occurred. The majority says, "The basis for this prong of Archie's termination was the inappropriate sexual relationship he was alleged to have had with the student at South High School." The majority further states, "Archie's contradictory statements at the hearing before the Commission - first that he never had a relationship with the student, then that their relationship started only after she had graduated - cannot reasonably be accepted in light of the rest of the evidence, including Archie's own admission that the student was 17 years old when their sexual relationship began and that he could lose his teaching certificate because of the relationship."

However, Archie's position can reasonably be accepted because the former student was 17 even after she graduated. She did not turn 18 until August 2001. Further, when Archie denied having a relationship with the former student, it was following questioning pertinent to allegations that the relationship started while she was still a student. The majority mischaracterizes Archie's denial as a total denial by Archie that he ever had a sexual relationship with the former student. This is an unfair characterization since just a few responses earlier to questions by Douglas County, Archie acknowledged having a sexual relationship with the former student, but clarified that "it wasn't during the school year."

As to Archie's comment on the audio recording about losing his teaching license, contrary to the majority's assertion, such a statement is not necessarily an admission to having had a relationship while the former student was still enrolled at South High. To the extent the relationship started within two years of her graduation, it would appear that OPS policy prohibits such a relationship, and it would have been reasonable for Archie to believe that engaging in a relationship within two years of the former student's graduation could have cost him his job and his teaching certificate. There is nothing contradictory in Archie's testimony in this regard.

Again, our review is to determine whether there are sufficient facts to support the Commission's decision that this policy provision was not violated; it is not our role to determine

whether the former student, her mother, or Archie is more credible with regard to when the sexual relationship started. To the extent that Archie's conduct before commencing employment with the County even matters, there is evidence in the record before us to support Archie's position that while he did engage in a sexual relationship with the former student, it was not until "some time" after she graduated, and if believed, such a relationship would not have been prejudicial to the County when Archie applied to the DCYC in February 2003.

Because the record before us does in fact contain sufficient, relevant evidence to establish that Archie did not violate the two disciplinary provisions discussed above, I would affirm the district court's decision which affirmed the Commission's decision.